NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

RICHARD CARSON,

                              Plaintiff,                           Civ. No. 09-6126 (DRD)

v.                                                                **O P I N I O N**

VERNON TOWNSHIP,
VERNON TOWNSHIP POLICE DEPT.,
VERNON TOWNSHIP REPUBLICAN
COMMITTEE,
AUSTIN CAREW,
DAVID HERING, individually and in his
          official capacity as police officer
          of Vernon Township;
ANDREA COCULA, a/k/a "BUNNY"
COCULA;
HARRY SHORTWAY,
IRA WEINER,
HELEN CAREW,
PHILLIP WEILER,
ABC-XYZ ENTITIES, and
JOHN and JANE DOES,

                              Defendants.


LAW OFFICES OF DANIEL M. PEREZ, ESQ.
by: Daniel M. Perez, Esq.
93 Spring Street, Suite 505
Newton, NJ 07860

KELLY WARD & LAEMERS, LLC
by: Kevin D. Kelly, Esq.
93 Spring Street, Suite 401
P.O. Box 887
Newton, NJ 07860

*Attorneys for Plaintiff,*

GEBHARDT & KIEFER, P.C.
by: Richard. P. Cushing, Esq.
1318 Route 31
P.O. Box 4001
Clinton, NJ 08809-4001
    *Attorneys for Defendants Vernon*
    *Township, Vernon Township Police Dept.,*
    *Austin Carew, and Andrea Cocula,*
    *a/k/a "Bunny" Cocula*

BUDD LARNER, PC
by: Susanna J. Morris, Esq.
1939 Route 70 East, Suite 100
Cherry Hill, NJ 08003
    *Attorneys for Defendant*
    *David Hering*

METHFESSEL & WERBEL, PC
by: Riahna Johnson, Esq.
3 Ethel Road, Suite 300
P.O. Box 3012
Edison, NJ 08818
    *Attorneys for Defendant Andrea Cocula,*
    *a/k/a "Bunny" Cocula*

**Debevoise, United States Senior District Judge**

Plaintiff, Richard Carson, a member of the Township Council ("Council") of Defendant,

Vernon Township ("Township"), filed a Complaint and subsequently an Amended Complaint

against the Defendants, who include the Township, its Police Department, a police officer, the

Vernon Township Republican Committee ("VRC"), a number of individuals who were members

of the VRC and, in some cases, also members of the Council, including its Mayor. [1]  The

Amended Complaint charges that Defendants engaged in a conspiracy and through the use of a

---

[1] Although Plaintiff lists unnamed "John and Jane Doe(s)" and "ABC-XYZ" Entities as
Defendants, and additional individuals are mentioned in the Amended Complaint, there are no
specific claims asserted against any of them.  The Court therefore will disregard these parties in
this opinion.

coordinated pattern of threats, extortion, coercion, harassment and intimidation of Plaintiff

sought to force Plaintiff to vote and take positions on public issues as Defendants demanded and

ultimately to force him to resign his position as a member of the Council.

Plaintiff asserts claims of racketeering in violation of the United States Racketeer and

Corrupt Organizations Act, 18 U.S.C. §§ 1962(b), 1962(c) and 1962(d) ("RICO"); claims

pursuant to 42 U.S.C. § 1983 and the First and Fourteenth Amendment of the Constitution;

related State law statutes; and various State common law claims.

Defendants, Vernon Township, the Police Department, Mayor Austin Carew ("A.

Carew") and Andrea Cocula a/k/a "Bunny" Cocula, moved to dismiss Plaintiff's Original

Complaint pursuant to Fed. R. Civ. P. 12(b)(6).  Defendant David Hering later joined in the

motion.  This motion was later converted to a motion for judgment on the pleadings.  Pending

argument on Defendants' motion, Plaintiff cross-moved for leave to file an amended complaint

and for default judgment against the VRC.  Plaintiff's motion for leave to file an amended

complaint was granted, and Defendants' motion directed to the Original Complaint, as

supplemented by additional submissions, will be deemed to be directed to the Amended

Complaint.

Defendants take great umbrage at the charges contained in the Amended Complaint.  The

Township, the Vernon Township Police Department, A. Carew and Cocula filed a post hearing

supplemental brief in which they set forth their version of the events and provide copies of

emails which, according to Defendants, Plaintiff quoted in his Complaint only in part, creating a

totally misleading impression.

In essence these Defendants contend that Plaintiff wrote a note to a fellow council

member to the effect that he wished he could punch members of the public in the mouth; the note

3

was obtained and published by a reporter, Jesse Palladini; and the emails that Plaintiff quoted were designed to warn Plaintiff of dangers that the note had created for Plaintiff and to help protect him politically.

Quite obviously these factual allegations have no place in response to a motion to dismiss, where only well pleaded averments of the complaint can be considered. They are the subject of discovery and perhaps motions for summary judgment. They will not be considered in connection with the pending motion to dismiss.

On the other hand, the emails were mentioned in the Amended Complaint, and where Plaintiff has quoted a portion of them there will be included in this opinion by way of footnotes the unexpurgated versions of the emails.

For the reasons that follow: 1) the Police Department is dismissed as an independent defendant; 2) Defendants' motion to dismiss the federal and state RICO claims and the substantive due process claim set forth in Count Seven is granted with prejudice; 3) Defendants' motion to dismiss the other § 1983 claims is denied; Defendants' motion to dismiss the State common law claims is granted without prejudice.

## I.  BACKGROUND

**A. Procedural History**

Plaintiff initiated this case in the Superior Court of New Jersey. Defendants Harry Shortway, Ira Weiner, Helen Carew ("H. Carew"), and Philip Weiler were not parties to the Original Complaint. On the basis of federal question jurisdiction, A. Carew, Cocula, the Township, and the Police Department removed the case to this Court. The Plaintiff sought an entry of default as to Hering and VRC and moved for a default judgment. The motion for a default judgment was denied and the entry of default against Hering and the VRC was vacated.

4

On April 4, 2010, A. Carew, Cocula, the Township, and Police Department moved to dismiss the Complaint.  Plaintiff cross-moved to amend the Complaint, add defendants, and for default judgment against the VRC.  The Motion to amend the complaint was granted and the Motion to dismiss was deemed to be directed to the Amended Complaint.

**B. Factual Background**

The factual contentions below are drawn from Plaintiff's Amended Complaint and are assumed to be correct.  See, e.g., Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997).

Plaintiff, Richard Carson, is a resident of the Township, a member of the VRC, and a paid, duly elected member of the Council.  He is also a volunteer with the Township's ambulance squad.  The four year term to which Plaintiff was elected to serve on the Council began January 1, 2008.

Although not explained in the Amended Complaint, the Township appears to be a "council-manager plan" municipality.[2]  (Def. Township, Police Department, A. Carew, and Cocula's Br. Supp. Mot. Dismiss 24-25.)  See N.J. Stat. Ann. § 40:69A-81 to § 40:69A-98 (West 2010). The Plaintiff maintains that the Township is regularly engaged in interstate commerce. For example, the Township employs individuals and withholds federal income taxes and payments for federal benefit programs; it accepts federal funds; enters into contracts with vendors from outside the State of New Jersey; and its Police Department provides services on roads that cross from the Township to neighboring New York State.  The Police Department is a

_____

[2] New Jersey law provides in relevant part that a municipality governed by the council-manager plan "shall be governed by an elected council and by an appointed municipal manager, and by such other officers and employees as may be duly appointed pursuant to this article, general law or ordinances."  N.J. Stat. Ann. § 40:69A-82 (West 2010).  It further provides that, the "municipal council shall consist of five members, unless otherwise provided in the municipal charter, who. . . serve for a term of 4 years."  Id. § 40:69A-83.

5

municipal law enforcement agency established by the Township. See N.J. Stat. Ann. § 40A:14-118 (West 2010). Hering retired from his position as a police officer for the Township on April 1, 2010. Hering is sued in his individual and official capacities.

The Plaintiff, A. Carew, and Shortway are on the Council. Plaintiff alleges that under New Jersey law, A. Carew, as Mayor of the Township, was the Township's highest-ranking official and was vested with the decision and policy making duties of the Township.[3] The Amended Complaint also does not specify that Cocula is a member of the Township's Land Use Board, but this fact is not in dispute. (Original Complaint ¶ 2; Def. Township, Police Department, A. Carew, Cocula Br. Supp. Mot. Dismiss 24-25.) Plaintiff alleges that the Defendants conspired to appoint Shortway to fill the Council seat when Plaintiff resigned from it under duress. After Plaintiff revoked his revocation, Shortway was elected to the Council and became Deputy Mayor of the Township on January 1, 2010. It is undisclosed whether the other three individual Defendants, Weiner, H. Carew, and Weiler are on the Council.

Defendant VRC is a municipal committee of a political party and organized pursuant to N.J.S.A. § 19:5-2. The VRC includes members who are not charged with any of the offenses alleged in the Amended Complaint. Defendants A. Carew, Hering, Cocula, Shortway, Weiner, H. Carew, and Weiler are residents of Vernon Township and active members of the VRC. Plaintiff alleges that Cocula has acted as de facto leader of the VRC since 1990.

The Plaintiff alleges that the VRC, Hering, Cocula, and Weiner controlled the Township government with "an iron fist," by, for example, forcing elected members of the Council to resign so that the Defendants could appoint a person of their choosing to fill the open seats. The purpose of this pervasive control was to ensure that only individuals who would execute the

---

[3] According to N.J.S.A., § 40:69A-86, the municipal charter must provide that the mayor is either elected by the council or directly by the voters; in either event he or she is also one of the four members of the council. Id. § 40:69A-86.

Defendants' directions would serve on the Council, be appointed to other influential positions, or receive municipal contracts for services.

Members and associates of the VRC, including the individual Defendants, met at regular intervals in Cocula's home and the Township's municipal building. Despite not being open to the public, decisions were made in these meetings regarding the Township's operations. For example, Cocula, A. Carew, and three other members of the VRC met privately on November 8, 2008, at 3:30pm in Township Municipal Building. At this meeting it was decided that the Township's Auditor, Attorney, and Prosecutor would each be reappointed at the Township's municipal reorganization meeting on January 1, 2009. It was also decided that A. Carew and Melinda Carlton, the Township Manager, would meet with the Township's Attorney to discuss the VRC's concerns. Additionally, the VRC members present at the meeting decided that they would seek resumes of applicants for the position of Chief Financial Officer and Assistant Manager of the Township for the purposes of reviewing such resumes and filling the positions.

Plaintiff was one of eight Council members forced to resign before the end of their elected term of office between 2003 and 2008.[4] The Plaintiff asserts that to his knowledge, this number of resignations in a single municipality is unprecedented. Each resignation resulted in a replacement appointed by the remaining Council members from nominees submitted by the VRC and the individual Defendants. Plaintiff alleges that the Defendants forced the decisions of the eight Council members by attempting to control the Council members' official actions, and when they were unable to do so, harassed and intimidated the Council members and their families.

The Defendants' attempt to control the actions of the Plaintiff in Council meetings began early in his term with Cocula instructing him to just "sit there and look pretty," not to ask

---

[4] Plaintiff names Glenn McLaughlin (Am. Compl. ¶ 24-25) as one of the eight members who were forced to resign from the Council.

7

questions, not to make comments, and to simply "follow" the lead of A. Carew and Councilman James Oroho in voting on resolutions and ordinances. Cocula even sent text messages to the Plaintiff during Council meetings instructing him how to vote.

During a Council meeting in March of 2008, the President of the Township's Historical Society, Jessica Palladini, spoke about a Pow-Wow that had been held in Vernon. Plaintiff commended her efforts and remarked that the event was a true benefit for the Township. Shortly thereafter, Cocula called the Plaintiff in a state of rage and upbraided him for "giving that woman a forum" and for complementing Ms. Palladini and the event. According to Cocula, Ms. Palladini was "the enemy" and Plaintiff was forbidden from ever speaking to, or even acknowledging Ms. Palladini's presence at meetings. Over the following months the Plaintiff further broke from Cocula's instructions. During Council meetings he asked questions about matters before them, including the town center and sewer system. He occasionally took positions on resolutions that were contrary to A. Carew and Oroho. When Plaintiff did so Cocula and Hering contacted the Plaintiff immediately after Council meetings and yelled, threatened, and warned him to stop.

Beginning in early September 2008, the Defendants regularly encouraged the Plaintiff to resign his Council seat. On September 7, 2008, Plaintiff, Cocula, and Weiner met in Cocula's dining room.[5] During this meeting, Cocula and Weiner told the Plaintiff that he was an "embarrassment" and "you got to get off" the Council and threatened that if he did not resign he would be harmed. (Am. Compl. ¶ 33.)

---

[5] Cocula later provided a sworn statement to investigators from the Vernon Police Department and the Sussex County Prosecutor's Office regarding this meeting and one that took place November 7, 2008, which is detailed later in this opinion.

The Plaintiff includes in the Amended Complaint quotations from a number of threatening e-mails that were sent by Cocula to the Plaintiff. They are as follows:[6]

September 9, 2008, copying Hering: "YOU WILL get hurt.... I promise you…. I warned you and so did Dave [defendant HERING] and Austin [defendant CAREW] and Ira [defendant WEINER]. This is very serious. ~B~" (Am. Compl. ¶ 34.)[7]

Also on September 9, 2008:

> Hey Rich ~ just finished cleaning up and spoke to Dave [HERING] for a few minutes. You need to lay very low for now. And not be seen at Austin's office you have to become invisible for the next week or more until this blows over. . . . We have tried to protect you many times but it seems like you don't want to GET IT.. I am truly at the end of my rope..

(Am. Compl. ¶ 35.)[8]

September 10, 2008: "MY advice to you is to NOT be seen around for a few weeks. And be aware of what is around you." (Am. Compl. ¶ 36.)[9]

---

[6] All quotations are reproduced verbatim from the Amended Complaint.

[7] The unexpurgated email reads: **Hello Rich – I told you today she [Palladini] has your email address and she will get your phone number also. I strongly suggest you do not call her and if by any chance she gets near you some where just hurry away and say you are late for work, a doctor's appointment. A test at the hospital. Do not get in any conversation with her** YOU WILL get hurt. I promise you. I warned you and so did Dave and Austin and Ira. This is very serious. -B- (Emphasis added regarding the part omitted by Plaintiff.)

[8] The unexpurgated email reads: Hey Rich – just finished cleaning up and spoke to Dave [HERING] for a few minutes. You need to lay very low for now. And not be seen at Austin's office you have to become invisible for the next week or more until this blows over. **She [Palladini] will not stop so YOU have to be on your toes and expect anything from her at any time when you least expect it. . don't know what else to tell you.** We have tried to protect you many times but it seems like you don't want to GET IT. I am truly at the end of my rope . . **I need to keep Vernon positive and the upcoming campaign. We didn't have this problem getting you elected with Glenn and Jim. . no one was out there creating issues. We just dealt with what the issues were facing the township.. So with that said I am tired . . . long day and longer one tomorrow. 3 meetings. And 2 of them will be intense. Have a good night and stay in touch with me and also Dave. He has been a BIG help.** (Emphasis added regarding the part omitted by Plaintiff.)

[9] The unexpurgated email reads: **Rich – I am not suggesting a leave at this time and never referred to taking a leave that would only make things more obvious. Missing a meeting or**

September 12, 2008, copying Hering "the best thing for you to do right now is not to be seen in Vernon. . . . Dave [HERING] if I missed anything please just add it to this email and forward it." (Am. Compl. ¶ 37.)[10]

Also on September 12, 2008: "I warned you many times as did Dave [HERING] and Austin [CAREW]."[11]

September 26, 2008, copying Hering:

> Rich.. do not respond to me I have nothing else to say except this. I am very upset with you. . . . I am ashamed to say that I brought you to the table...SO like I told you here at my dining room table with Ira [WEINER] and Dave [HERING] and every meeting we have had with you to try to make you a good councilman. Dave & I

---

two because of personal issues is taking one step at a time . . . **If this continues to escalate and gets a twist on it, this is a possibility to "Dirty" the name of the Republican Party in the town and county . . . I believe this is their mission.** MY advice to you is to NOT be seen around for a few weeks. And be aware of what is around you. **She [Palladini] will attempt to approach you. She thinks you are her FRIEND. . . she is weaving her web now. . . she sued me along with others. . .and several people before me. . and after me. This caused me and my family much stress at a bad time and all money to defend myself. . . –B-** (Emphasis added regarding parts omitted by Plaintiff.)

[10] The unexpurgated email reads: **Hi Rich – it was not an easy meeting for Austin. And if you were there it would have been very very hard for him . . .Jessie Palladini is on a mission to get you, like I said they need to create an issue to use against the Republicans. It was a very tense meeting and there were quite a few of them. If you were there you would have had to say something and they were spread out around the room. I am sure they would have carried on. . .** the best thing for you to do right now is not to be seen in Vernon. . . **She [Palladini] has a pretty big group of followers tonight and they all had their pads and were very well versed on what they needed to say and she just coached them from the sidelines. . .she is very dangerous BUT very intelligent too. . .so now she has lots of time to create trouble in Vernon. . .**Dave if I missed anything please just add it to this email and forward it. (Emphasis added regarding parts omitted by Plaintiff.)

[11] The unexpurgated email reads: **. . .What is the politically right thing to do right now for the Republican Party as a whole BUT especially here is Vernon. So I am asking you to contact me and David before you do anything regarding the "NOTE". If you choose not to contact us that is fine BUT you have to know that Mike will not do any damage control politically for you. We know the town characters here a lot better than Mike. And I must remind you again. We did not create this issue we are trying desperately to keep the lid on this here for the next few weeks. Or you will have Mary Ellen up here come January and those people are so intense right now they could work on a recall petition with your name on it. . .** I warned you many times as did Dave and Austin. **Call me if you wish. –BUNNY-** (Emphasis added regarding parts omitted by Plaintiff.)

> have spent countless hours with you and you DO NOT listen.  You
> yes us and then do whatever you want to. In frustration I called Ira
> [WEINER] in here to try to help you and us to keep Vernon on
> track..So do what you want to, go where ever and answer any
> phones you care to. I will not help you or come to your aid..if the
> others do that is OK with me that is their business.  But I told you
> the other day I surrender I give up with you.

(Am. Compl. ¶ 39.)

On September 23, 2008, Plaintiff went to the Sussex A&P to do his grocery shopping. He did not go to the Vernon A&P, which he had previously been told to avoid.  That evening, at 5:25pm, Cocula contacted the Plaintiff by telephone and stated that she was "angry" with him and that he could have been "confronted" by his "enemies in that part of town." (Am. Compl. ¶ 45.)  At 5:45 p.m., shortly after he got off the phone with Cocula, Plaintiff received a telephone call from Hering, who essentially repeated what Cocula had said.

The Plaintiff alleges that during September and October 2008 Hering and Cocula repeatedly threatened and intimidated the Plaintiff.  The Amended Complaint specifies that on September 27, 29, 30, October 2, 4, 6, 7, 9, 10, 14, 15, 16, 17, 18, 20, 21, 22, 23, 25, and 27, 2008, the Plaintiff was contacted by Hering, A. Carew, or both, and threatened, intimidated, and harassed by them.  They warned him to stay out of the Township, to "be careful," and "watch your back," to "not to be seen around town," and that he should not do his grocery shopping at the Vernon A&P, go to the Vernon post office, attend community events, eat at local restaurants, or attend church. (Am. Compl. ¶ 41-42.)  Hering told the Plaintiff to cease volunteering for the Township ambulance squad.

Additionally, during September and October, 2008, numerous telephone calls for the Plaintiff were received at his workplace.  When the Plaintiff's colleagues asked who was calling,

the callers would hang up.  The Plaintiff alleges that the individuals who made these phone calls were one or more of the individual defendants or their agents or coconspirators.

On October 3, 2008, the Plaintiff's church, St. Thomas' Episcopal Church in Vernon, sponsored a carnival at Mountain Creek, the town center.  The Plaintiff volunteered to work in a booth at the event.  Hering warned the Plaintiff not to attend the carnival. The Plaintiff attended anyway, believing that he would be safe at a church carnival. While there, he spent most of his time with the minister of his church.  When Hering learned that the Plaintiff had defied his directive, he became angry and "in sum and substance" told the Plaintiff that "[c]arnivals attract lots of kids. You went there alone. Someone could get the impression that you are a child molester or pedophile. I hope nothing gets out about that." (Am. Compl. ¶ 44.)

Plaintiff alleges that this campaign of threats and harassment was waged on behalf of all of the individual defendants and in order to further the conspiracy to force Plaintiff's resignation. He maintains that as a result of this campaign of threats and intimidation he became increasingly alarmed and so fearful for his personal safety that he significantly changed his lifestyle and routines.  He informed his supervisors and the security director at his workplace of threats against him, arranged for his son to perform errands on his behalf, stopped going to the Post Office, stopped going to the Vernon A&P, and almost completely ceased his public appearances in the Township.  He routinely checked his surroundings when he left his home and workplace, scanning surrounding areas and streets for would-be perpetrators of violence against him, and parked in different locations.

On the evening of November 7, 2008, A. Carew, Hering, Cocula, Shortway, Weiner, H. Carew, and Weiler met in Cocula's home and agreed to use Hering's position as an armed law

enforcement officer to force the Plaintiff to sign letters of resignation.[12]  Cocula, Weiner, and Hering used Cocula's computer to craft a letter of resignation bearing the Plaintiff's name. Shortway, Weiler, and H. Carew were still in Cocula's home when this occurred.  Hering then called the Plaintiff and told him that "a decision had been made" by the VRC and "the time had come" for the Plaintiff to "do the right thing and resign" from his elected Council position. (Am. Compl. ¶ 46.)  Hering instructed the Plaintiff to meet him the following day, November 8, 2008, at 3:00 p.m. in the Vernon Township Police Department parking lot.

On November 8, 2008, the Plaintiff arrived as instructed at the Police Department parking lot.  Upon his arrival, he observed Cocula in the parking lot in her vehicle. The Plaintiff was immediately approached by Hering, who was on duty, armed and in full police uniform. Hering handed four identical prepared letters of resignation to the Plaintiff and demanded that the Plaintiff sign each copy immediately.  The Plaintiff requested time to consider his resignation and the opportunity to prepare his own letter.  Hering adamantly refused.  The Plaintiff maintains that he feared for his safety and that of his family.  Feeling he had no other choice but to sign the letters immediately, he did so with Hering standing next to him.  Hering then walked over to Cocula's car, opened the passenger side door, and handed her the letters.

The Plaintiff alleges that A. Carew, Hering, Shortway and Cocula immediately spread word that he had resigned his Council position.  Shortway called a member of the press and informed the reporter of the Plaintiff's resignation and that he, Shortway, would be filling the empty Council seat.  Posts on internet forums appeared online, including www.nj.com/forums/vernon and www.voicesofvernon.com, in which the Plaintiff's resignation

---

[12] Cocula later provided a sworn statement to investigators from the Vernon Police Department and the Sussex County Prosecutor's Office regarding this meeting and one that took place September 7, 2008.

was debated and discussed.  Within three hours of signing the letters of resignation the Plaintiff started receiving telephone calls from individuals who had heard and wanted to know the details.

The following day, November 9, 2008, the Plaintiff wrote a letter rescinding his resignation. The Plaintiff delivered this letter to the Township Manager and Township Clerk at their offices in the Township municipal building.  While in their offices, the Plaintiff observed that his resignation letter had been delivered to both officials.  The Plaintiff alleges that A. Carew and Cocula placed the resignation letters on the desks of the Township Manager and Township Clerk.

On November 12, 2008, Cocula sent an e-mail to the Plaintiff regarding the letter of resignation, copying Hering at his david_hering@hotmail.com account.  "We know the town and the characters here," she wrote.

> We did not create this issue[,] we are trying desperately to keep the lid on this here the next few weeks.  Or you will have Mary Ellen up there come January and those people are so intense right now they could work on a recall petition with your name on it. I warned you many times as did Dave [HERING] and Austin [CAREW]. Call me if you wish. ~BUNNY~

(Am. Compl. ¶ 52.)

The Plaintiff claims that as a result of his resignation and the Defendants immediately spreading the news of it, he has been rendered politically impotent.  His ability to govern has been irrevocably impaired and he stands little to no chance of being reelected.  He has been marginalized within the Township and the Sussex County Republican party.  He has been stigmatized and ostracized by various residents and municipal employees. His reputation has been besmirched, he has lost business and economic benefits, and he and members of his family have been subjected to severe emotional strain and distress.

Officials from the Sussex County Prosecutor's Office and the Vernon Township Police Department have investigated the events of November 8, 2008.  On January 21, 2009, Hering received a Preliminary Notice of Disciplinary Action ("Disciplinary Notice") from the Township Manager.  According to the Amended Complaint, the Disciplinary Notice stated:

> **1. CHARGE(S):**
> N.J.A.C.4A:2-2.3(a)  6  Conduct  unbecoming  a  public employee, 11 Other Sufficient cause.
> Vernon Police Department Rules and Regulations: Section One, A.1.e., Section Ten A. 10, Section Ten, B. Rule 3; Section Ten, B. Rule 28.
>
> **SPECIFICATIONS**:
> On duty date November 8, 2008 while in uniform, Plt. HERING engaged in prohibited political activity.  Specifically, he approached a member of the Township Council with unsigned letters of resignations authored by Plt. HERING. He then secured the signature of the Council Person and tendered the signed letters of resignation to another member of the Vernon Township Republican Party.

(Am. Compl. ¶ 55.)

On March 18, 2009, following an administrative hearing, Hering was found guilty of all charges and a five-day suspension was issued.  Hering appealed his conviction to the Superior Court of New Jersey.  The Plaintiff alleges that Hering never served his five-day suspension because his conviction was vacated by Shortway and his suspension was deemed moot by the Township.

Shortway became a candidate for Council in 2009, and was elected in November of that year.  On January 1, 2010, he began his Council term and came Deputy Mayor of the Township. The Plaintiff alleges that throughout 2009, and after taking the oath of office as Deputy Mayor, Shortway remained in regular contact with his co-conspirators Hering, A. Carew, Weiner, H.

Carew, and Weiler and that they agreed to use Shortway's position as Deputy Mayor to somehow change Hering's conviction.

Some time around January 2010, Hering told Township officials that he planned to retire. Hering's retirement agreement ("Retirement Agreement"), dated March 4, 2010, provided that he would retire from the Police Department, effective April 1, 2010, that "the final discipline determination will be amended to indicate that it was vacated," and that the Township would not pursue disciplinary action against Hering "as the 5 day suspension will be moot of OFFICER HERING retires." (Am. Compl. ¶ 62.)

During the March 4, 2010, public Council meeting, a resolution regarding Hering's Retirement Agreement[13] came before the Council.  Plaintiff recused himself entirely from the resolution.  Shortway voted in favor of adopting the resolution and signed the Retirement agreement on behalf of the Township.

## C. Claims of the Amended Complaint

Based on these facts, the Amended Complaint pleads for relief under a variety of federal and state law theories.  The Claims are asserted in sixteen different counts.  In Counts One through Seven and Nine through Sixteen Plaintiff pleads for relief against the VRC, A. Carew, Hering, Cocula, Shortway, Weiner, H. Carew, and Weiler.  In Count Eight Plaintiff pleads for relief against the Township and the Police Department.  The claims are as follows:

*Federal and State RICO Claims*

| | |
|---|---|
| Counts 1 & 2 | Racketeering in Violation of the United States Racketeer Influenced and Corrupt Organizations Act ("RICO") (18 U.S.C. § 1962(b) and § 1962(c)) |
| Count 3 | Conspiracy to Commit Racketeering in Violation of RICO (18 U.S.C. § 1962(d)) |

---

[13] Resolution #10-62, entitled "Resolution of the Governing Body of the Township of Vernon to Execute the Retirement and Separation Agreement for Police Officer David Hering."

16

Count 9          Racketeering and Conspiracy to Commit Racketeering in Violation of the New Jersey Racketeer Influenced and Corrupt Organizations Act Claim (N.J.S.A. § 2C:41-1)

*Claims Under 42 U.S.C. § 1983*

Count 4          Conspiracy to Deprive Plaintiff of Protected Free Speech and Expression Rights Under the First and Fourteenth Amendments of the United States Constitution

Count 5          Conspiracy to Deprive Plaintiff of Protected Assembly Rights Under the First and Fourteenth Amendments of the United States Constitution

Count 6          Conspiracy to Deprive Plaintiff of Protected Rights to Practice Religion under the First and Fourteenth Amendments of the United States Constitution

Count 7          Conspiracy to Deprive Plaintiff of Substantive Due Process Rights under the Fourteenth Amendments of the United States Constitution

Count 8          Municipal Liability

*State Law Claims*

Count 10         Conspiracy to Deprive Plaintiff of Rights Under New Jersey Civil Rights Act

Count 11         Abuse of Process

Count 12         Fraud and Deception

Count 13         Intentional  Infliction of Emotional Distress

Count 14         Assault

Count 15         Prima Facie Tort

Count 16         Conspiracy

For the above claims the Plaintiff seeks treble and punitive damages in an amount to be determined by a jury, attorney's fees, costs of investigation and litigation, and any further relief as may be warranted.

## II.  DISCUSSION

### A. Standard of Review

Federal Rules of Civil Procedure 12(c) and 12(h)(2)(B) permit a court to dismiss a complaint for failure to state a claim upon which relief can be granted.  In deciding a motion for judgment on the pleadings which asserts a defense of failure to state a claim upon which relief may be granted, the Court applies the same standard of review as under a Rule 12(b)(6) motion. See e.g., Turbe v. Gov't of V.I., 938 F.2d 427, 428 (3d Cir. 1991).  When considering a Rule 12(c) motion, the Court must accept the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff.  Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997).  The Court's inquiry, however, "is not whether plaintiffs will ultimately prevail in a trial on the merits, but whether they should be afforded an opportunity to offer evidence in support of their claims."  In re Rockefeller Ctr. Prop., Inc., 311 F.3d 198, 215 (3d Cir. 2002).

The Supreme Court recently clarified the Rule 12(b)(6) standard in two cases: Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009), and Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007).  The decisions in those cases abrogated the rule established in Conley v. Gibson, 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim, which would entitle him to relief."  In contrast, Bell Atlantic, 550 U.S. at 545, held that "[f]actual allegations must be enough to raise a right to relief above the speculative level."  Thus, the assertions in the complaint must be enough to "state a claim to relief that is plausible on its face," id. at 570, meaning that the facts alleged "allow[] the court to draw the reasonable inference that the defendant is liable for the conduct alleged."  Iqbal, 129 S. Ct. at 1949; see also, Phillips v.

County of Allegheny, 515 F.3d 224, 234-35 (3d Cir. 2008) (In order to survive a motion to dismiss, the factual allegations in a complaint must "raise a reasonable expectation that discovery will reveal evidence of the necessary element," thereby justifying the advancement of "the case beyond the pleadings to the next stage of litigation.").

When assessing the sufficiency of a complaint, the Court must distinguish factual contentions – which allege behavior on the part of the defendant that, if true, would satisfy one or more elements of the claim asserted – from "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." Iqbal, 129 S. Ct. at 1949. Although for the purposes of a motion for judgment on the pleadings the Court must assume the veracity of the facts asserted in the complaint, it is "not bound to accept as true a legal conclusion couched as a factual allegation." Id. at 1950. Thus, "a court considering a [motion for judgment on the pleadings] can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Id.

**A. Claims Against the Police Department**

A police department is not a separate legal entity; rather it is a part of the municipality it serves. N.J.S.A. § 40A:14-118 (West 2010). Consequently the Police Department will be dismissed as an independent defendant in this case, and the claims against it will be deemed to be asserted either against the Township or against individual police officers, i.e., Hering. See Adams v. City of Camden, 461 F. Supp. 2d 263, 265 (D.N.J. 2006).

**B. Counts One, Two, Three, and Nine: Federal and State RICO Claims**

Counts One, Two, and Three allege violations of, respectively, §§ 1962(b), (c), and (d) of RICO. Section (b) provides:

> It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to

19

> acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

Section (c) provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

Section (d) provides:

> It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

RICO "enterprise," as defined in the statute, includes any "individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). A RICO enterprise need not be a formal corporation, group or organization. Instead, the statute is satisfied by a showing of a formal or informal group of persons, "associated for a common purpose of engaging in a course of conduct." United States v. Turkette, 452 U.S. 576, 583 (1981).

A "pattern" of racketeering activity requires a showing that the predicate acts relied upon are "related, and that they amount to or pose a threat of continued criminal activity." H. J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 239 (1989). Predicate acts of racketeering activity include a variety of federal and state criminal offenses, including extortion, in violation of state law and the Hobbs Act. 18 U.S.C. § 1961(1); see 18 U.S.C. § 1951 (Hobbs Act).

The threat of continued criminal activity can be shown through "closed ended continuity" by proving "a series of related predicates extending over a substantial period of time." H.J., 492 U.S. at 242. The Court of Appeals has held that "twelve months is not a substantial period of

20

time" for purposes of establishing a pattern of racketeering activity.  Hughes v. Consol-Pennsylvania Coal Co., 945 F.2d 594, 611 (3d Cir. 1991).

RICO plaintiffs may also satisfy the threat of continued criminal activity element by a showing of "open ended continuity."  To establish this type of continuity, it need not be shown that predicate acts were engaged in over an extended period of time.  Instead, plaintiff must show that there was a threat of continuing criminal activity "extending indefinitely into the future."  H.J., 492 U.S. at 242.  One way of establishing open ended continuity is to prove that the predicate acts "are part of an ongoing entity's regular way of doing business."  Id.  Note that it must be the predicate acts, not some other type of misbehavior, that form part of the entity's regular way of doing business.  Gregory P. Smith, Civil RICO A Definitive Guide 148 (3rd ed. 2010).

A violation of Section 1962(c) is properly pleaded by a showing of: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  Sedima v. Imrex Co., 473 U.S. 479, 496 (U.S. 1985).

To plead a violation of 1962(d) adequately, a plaintiff must set forth allegations that address the period of the conspiracy, the object of the conspiracy, and the certain actions of the alleged conspirators taken to achieve that purpose.  Glessner v. Kenny, 952 F.2d 702, 714 (3d Cir. 1991).  Additional elements include agreement to commit predicate acts and knowledge that the acts were part of a pattern of racketeering activity. Shearin v. E.F. Hutton Group, Inc., 885 F.2d 1162, 1166 (3d Cir. 1989).

Count nine alleges a violation of the New Jersey Racketeering Influenced and Corrupt Organization Act.  N.J.S.A. §  2C:41-1.  At the outset the Court notes that the New Jersey statute "borrows its structure, purpose and remedies from Federal RICO."  State v. Ball, 268 N.J. Super.

21

72, 98 (App.Div. 1993), *aff'd*, 141 N.J. 142 (N.J. 1995). New Jersey heeds federal case law in construing its statute. State v. Ball, 141 N.J. 142, 156 (N.J. 1995).

The defendants argue that the series of alleged racketeering acts in the amended complaint amount to nothing other than a short-term series of actions lasting less than twelve months and hence there is no "pattern" of racketeering activity. They also contend that the plaintiff's amended complaint fails to define the structure of a RICO "enterprise," and appears to equate the enterprise solely with the alleged actions seeking plaintiff's resignation.

Plaintiff argues that the racketeering also amounted to a "pattern" of racketeering activity because the acts amounting to extortion were related and that they were committed for a sufficiently long period of time. Additionally, plaintiff argues that the racketeering amounted to a "pattern" because there was a threat of ongoing racketeering activity since the conduct attributable to the individual defendants was consistent with their regular way of operating their affairs.

Plaintiff also contends that the "enterprise" requirement for RICO liability has been satisfied with regard to the instant motion because to survive a motion to dismiss "it is enough that a plaintiff state what entities it believes constitute an enterprise" and "so long as a civil RICO plaintiff pleads facts indicating that the various associates functioned as a unit, the plaintiff has satisfied its burden at the motion to dismiss stage."

In subsections (b) and (c) of 18 U.S.C. § 1962 a key component of the offense is the engaging in the proscribed conduct through a "pattern of racketeering activity." The conspiracy subsection (d) necessarily incorporates the element of engaging in the proscribed conduct through a "pattern of racketeering activity." Plaintiff argues that the Defendants obtained property through extortion of the plaintiff, a duly elected public official whom they "controlled,

22

manipulated, and outright owned in ways which are so bizarre that they are difficult to comprehend."  Plaintiff contends that defendants committed racketeering, through their coordinated pattern of threats, extortion, coercion, harassment, and intimidation which are chargeable under the Hobbs Act, 18 U.S.C. § 1951, Theft By Extortion, N.J.S.A. 2C:20-5, Threats and Other Improper Influences in Official and Political Matters, N.J.S.A. 2C:27-3, Official Misconduct, N.J.S.A. 2C:30-2, Obstructing Administration of Law or Other Governmental Function, N.J.S.A. 2C:29-1, and Unlawful Official Business Transaction Where Interest is Involved, N.J.S.A. 2C:27-9.

The racketeering activity alleged in the Complaint "consisted of the coordinated pattern of threats against, and extortion, coercion, harassment and intimidation of plaintiff.  As described above these acts were chargeable under the Hobbs Act, 18 U.S.C. 1951; and under New Jersey law which make such crimes punishable by imprisonment for more than one year… [the purpose of which] was to force plaintiff to resign from his paid, duly elected position to which he was entitled to benefits and other privileges as a member of the Vernon Township Council, prior to the expiration of his term of office, and replace him with defendant SHORTWAY so that individual defendants could illegally and unlawfully control the business of VERNON TOWNSHIP" (Amend. Compl. Para 73-74).

The glaring, fatal defect in Plaintiff's RICO claims is that he has not alleged, and probably cannot allege, the presence of RICO racketeering activity.  "Racketeering activity" is defined at great length in 18 U.S.C. § 1961(1).  The closest offense listed in that section Plaintiff could find was extortion, which is why he relies on the Hobbs Act.  Fatal to Plaintiff's claims, attempting to drive a person out of public office, no matter how coercive the tactics, is not extortion.

In <u>Scheidler v. National Organization for Women, Inc.</u>, 537 U.S. 393 (2003), NOW sued the Pro-Life Action Network (the Petitioner), alleging that the Petitioner violated RICO's §§ 1962 (a), (c), and (d) by engaging in a conspiracy to shut down abortion clinics through a pattern of racketeering that included acts of extortion in violation of the Hobbs Act.  The Supreme Court held that deprivation of the right to conduct business did not constitute extortion.  Rather, the Hobbs Act requires a wrongful taking of property, that is, "a person must 'obtain' property from another party to commit extortion" <u>Id.</u> at 404.  Shutting down a business, even though it was by coercion, is not extortion.  Plaintiff's loss or threatened loss of his council positions is not the surrender of property.  Therefore, while offenses, other than extortion, criminal and civil, may have been alleged, they are not predicate acts of racketeering activity under the statute.  While extortion is a RICO offense, Plaintiff has not pleaded, and probably cannot plead, facts constituting extortion, and consequently a federal RICO offense has not been pleaded.

A similar result is arrived at under the New Jersey RICO statute.  N.J. Stat. Ann. 2C:41-1 et seq.  In general, courts in New Jersey have stated, in the context of public employment, that:

> [t]he decisions are numerous to the effect that public offices are mere agencies or trusts, and not property as such. Nor are the salary and emoluments property, secured by contract, but compensation for services actually rendered. Nor does the fact that a constitution may forbid the legislature from abolishing a public office or diminishing the salary thereof during the term of the incumbent change its character or make it property . . . . In short, generally speaking, the nature of the relation of a public officer to the public is inconsistent with either a property or a contract right.

<u>Errichetti v. Merlino</u>, 188 N.J. Super. 309, 336 (Law. Div. 1982) (quoting <u>Taylor v. Beckham</u>, 178 U.S. 548, 577 (1900)).

The complaint does not allege that defendants obtained property from Plaintiff since his elected office was not property.  Hence no predicate acts are alleged that would constitute a

pattern of racketeering activity under federal or state law.  The RICO claims asserted in Counts

One, Two, Three and Nine are dismissed.  Because there is no likelihood that Plaintiff could

amend the Amended Complaint to allege a RICO offense, the dismissal will be with prejudice.

**C. Counts Four through Eight: 42 U.S.C. § 1983 Claims for Violations of Plaintiff's First**

**and Fourteenth Amendment Rights**

In Counts Four through Seven Plaintiff alleges that the Defendants conspired to deprive

him of a number of rights protected by the First and Fourteenth Amendments of the United

States Constitution; namely speech and expression, assembly, religion, and substantive due

process.  He claims that the Defendants, many of whom held public office, were acting under

color of state law when they deprived him of these rights.  In Count Eight, the Plaintiff charges

the Township and Police Department with municipal liability for these deprivations.[14]

Defendants Township, Police Department, A. Carew, Cocula, and Hering argue that

Plaintiff has not stated a claim for Counts Four through Eight because he has not sufficiently

alleged that they were not acting "under color of law."  These Defendants rely entirely on this

argument in addressing Count Eight, Municipal liability; and the merits of the alleged violations

of Plaintiff's Constitutional rights.

United States Code Title 42 Section 1983 "provides a cause of action for 'the deprivation

of any rights, privileges, or immunities secured by the Constitution and laws' by any person

acting 'under color of any statute, ordinance, regulation, custom, or usage, of any State or

Territory.'" Gomez v. Toledo, 446 U.S. 635, 638 (1980) (quoting § 1983).  In order to state a

claim under § 1983, a plaintiff must allege (1) that a person has deprived him of a federal right;

and (2) the person who deprived him of that right acted under color of state or territorial law.  Id.

at 640; see also, e.g., Groman v. Twp. of Manalapan, 47 F.3d 628, 633 (3d Cir. 1995).  To state a

---

[14] As discussed in Section "A," the Police Department is dismissed as a defendant.

claim for municipal liability under § 1983, the plaintiff must sufficiently allege that (3) "there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." City of Canton v. Harris, 489 U.S. 378 (1989).

*i. Alleged Deprivation of Plaintiff's First and Fourteenth Amendment Rights*

The first step "in evaluating a section 1983 claim is to identify the exact contours of the underlying right said to have been violated and to determine whether the plaintiff has alleged a deprivation of a constitutional right at all." Nicini v. Morra, 212 F.3d 798, 806 (3d Cir. 2000). In Counts Four, Five, and Six, respectively, Plaintiff alleges that Defendants' conduct violated his First Amendment rights of free speech and expression; assembly; and to practice religion.  In Count Seven he alleges that the Defendants deprived him of his Fourteenth Amendment right of substantive due process.

The First Amendment states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."  U.S. Const. amend. I.  The rights guaranteed by the First Amendment apply against the states through their incorporation into the due process clause of the Fourteenth Amendment.  See, e.g., Gitlow v. People of N.Y., 268 U.S. 652, 666 (1925) (regarding First Amendment freedom of speech); Elfbrandt v. Russell, 384 U.S. 11, 18 (1966) (regarding First Amendment freedom of association).

In Count Four of the Amended Complaint, the Plaintiff makes out a plausible claim for violation of his First Amendment right to free speech and expression.  This opinion will focus on the alleged conduct of the Defendants in retaliation for Plaintiff's comments and votes in Township Council meetings.  See Miller v. Mitchell, 598 F.3d 139, 149 n. 9 (3d Cir. 2010)

(distinguishing between direct and retaliatory constitutional claims and explaining that a retaliation or subsequent punishment claim asks whether the Government is punishing the plaintiff for exercising his rights); see also Montiero v. City of Elizabeth, 436 F.3d 397, 404-05 (explaining that it is "clearly established that content-based restrictions on speech in a public forum are subject to strict scrutiny, while viewpoint-based restrictions violate the First Amendment regardless of whether they also serve some valid time, place, manner interests." (citations omitted)).

Retaliation for the exercise of constitutionally protected rights "is itself a violation of rights secured by the Constitution actionable under section 1983." White v. Napoleon, 897 F.2d 103, 111-12 (3d Cir.1990); see also Allah v. Seiverling, 229 F.3d 220, 224-25 (3d Cir.2000) ("Government actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right." (citation omitted)).  In order to plead a First Amendment retaliation claim, a plaintiff must allege that he or she (1) engaged in constitutionally protected conduct; (2) the defendants engaged in retaliatory action "sufficient to deter a person of ordinary firmness from exercising his constitutional rights[;] and (3) a causal link between these two elements. Thomas v. Independence Tp., 463 F.3d 285, 296 (3d Cir. 2006); see also, Miller, 598 F.3d at 147 ("To prevail on a retaliation claim, a plaintiff must prove (1) that he engaged in constitutionally-protected activity; (2) that the government responded with retaliation; and (3) that the protected activity caused the retaliation."  (citation omitted)).

Whether the conduct of the Plaintiff is constitutionally protected is a matter of law.  See Connick v. Myers, 461 U.S. 138, 148, n. 7 (1983) ("The inquiry into the protected status of speech is one of law, not fact.").  Political expression such as Plaintiff's positions and votes on

Township matters is unquestionably protected under the First Amendment.  See, e.g., Colson v. Gronholm, 174 F.3d 498 (5th Cir. 1999) (city council member's positions and votes on city matters is protected speech under the First Amendment); Velez v. Levy, 401 F.3d 75, 97-98 (2d Cir. 2005) (explaining that publicly elected school board member's votes and positions are clearly protected speech).

> The First Amendment was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.  Speech concerning public affairs is more than self-expression; it is the essence of self-government.  Accordingly, the [Supreme] Court has frequently reaffirmed that speech on public issues occupies the highest rung of the heirarchy [sic] of First Amendment values, and is entitled to special protection.

Connick, 461 U.S. at 145 (internal quotations and citations omitted).  "'The role that elected officials play in our society makes it all the more imperative that they be allowed freely to express themselves on matters of current public importance.'"  Republican Party of Minnesota v. White, 536 U.S. 765, 782 (2002) (quoting Wood v. Georgia, 370 U.S. 375, 395 (1962)); see also, Bond v. Floyd, 385 U.S. 116, 136-37 (1966) ("Legislators have an obligation to take positions on controversial political questions so that their constituents can be fully informed by them, and be better able to assess their qualifications for office; also so they may be represented in governmental debates by the person they have elected to represent them.").

Retaliatory conduct is actionable if it is intended to punish the plaintiff for exercising his free speech rights and under the circumstances it would be sufficient to deter a person of ordinary firmness from exercising his free speech rights.  O'Connor v. City of Newark, 440 F.3d 125, 128 (3d Cir. 2006).  The Third Circuit has stated that the threshold for showing First Amendment retaliation is "very low" and that "a cause of action is supplied by all but truly de

minimis violations." [15]  Id.  Although "it is generally a question of fact whether a retaliatory campaign of harassment has reached the threshold of actionability under § 1983," Suppan v. Dadonna, 203 F.3d 228, 233 (3d Cir. 2000), viewing the allegations of the Amended Complaint in the light most favorable to the Plaintiff, he has adequately pled retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and a causal link between the constitutionally protected conduct and the retaliatory action.  Thomas, 463 F.3d at 296.  The Plaintiff alleges that the Defendants harassed and intimidated him in response to him speaking and making certain votes in Council meetings.  Among other things, Cocula and Hering called him immediately after Council meetings and threatened and harassed him.  The Plaintiff alleges that one or more of the Defendants or their conspirators made suspicious phone calls to his place of business.  Furthermore, Hering is alleged to have threatened to make false accusations that Plaintiff was a child molester.  The actions of the Defendants clearly go beyond the "standard comments made among politicians in the rough-and-tumble that is local politics." Hill v. Borough of Kutztown, 455 F.3d 225, 238 n. 16 (3d Cir. 2006) (regarding action for defamation brought by borough manager against borough mayor whose campaign of retaliatory harassment forced the manager to resign).

*Count Five: Alleged Deprivation of Plaintiff's Assembly Right*

*Count Six: Alleged Deprivation of Plaintiff's Right to Practice Religion*

Plaintiff unquestionably has a right of assembly and to practice his religion.  Deprivation of those rights are sufficiently alleged in Counts Five and Six as an integral part of the deprivation of his right of free speech and expression.  Improper pressure is alleged to have been

---

[15] Note that this standard appears to differ between Circuit Courts.  See Herring v. Chichester School District, 2007 WL 3287400 at *6 (E.D.Pa. 2007) (noting "that the threshold for showing First Amendment retaliation is lower in the Third Circuit than in the Fifth Circuit."); see also, Citizens for a Better Lawnside, Inc. v. Bryant, 2007 WL 1557479 at *4-5 (D.N.J. 2007).

imposed upon him to prevent him from participating in an activity of the church of his choice and from participating in community activities and from going to various public private and commercial places.

*Count Seven: Alleged Deprivation of Plaintiff's Substantive Due Process Rights*

In Count Seven the Plaintiff contends that the individual Defendants violated his substantive due process rights, which are protected under the Fourteenth Amendment, because their behavior "shocks the conscience." Although the conduct of the Defendants may well meet the "shocks-the-conscience test," Fagan v. City of Vineland, 22 F.3d 1296, 1302 (3d Cir. 1994), these allegations are subsumed by the particularized allegations that support Counts Four through Six or are "doomed to fail." Velez, 401 F.3d at 94; see also, Conn v. Gabbert, 526 U.S. 286, 293 (1999). What is allegedly shocking about the allegations of the Amended Complaint is their intent to deprive Plaintiff of his First Amendment rights. See Velez, 401 F.3d at 94. In other words, the facts, if proven, that would establish that the Defendants' actions were shocking, also constitute specific constitutional violations. See id. The Supreme Court has stated that "where another provision of the Constitution provides an explicit textual source of constitutional protection, a court must assess a plaintiff's claims under that explicit provision and not the more generalized notion of substantive due process." Conn, 526 U.S. at 293; see also DiBella v. Borough of Beachwood, 407 F.3d 599, 602 (3d Cir. 2005). Accordingly, Plaintiff's substantive due process claim is dismissed as redundant.

*ii. Action Under Color of State Law*

As a threshold matter in any section 1983 claim, it must be adequately alleged that the defendants acted under color of state law. Bonenberger v. Plymouth Twp., 132 F.3d 20, 23 (3d Cir. 1997). The Defendants in this Motion argue that Plaintiff failed to state a claim for Counts

Four through Eight of the Amended Complaint because they were not acting under color of state law when they "urged" the resignation of the Plaintiff; rather, they were acting as private citizens who were vigorously involved in local politics.  Accepting as true Plaintiff's allegations, one can legitimately infer that he alleges state action either directly or as members of a conspiracy conducted by state actors.

There are two categories of Defendants in this case.  There are those who held public office and performed the duties of public office, namely, A. Carew, the Mayor and a member of the Council; Hering, a police officer; Cocula, a member of the Township's Land Use Board; Shortway, the Deputy Mayor and a member of the Council; and perhaps other members of the Council.  The Township itself, of course, engages in state action.  It may turn out that some of the Defendants were not Township officials and acted as private citizens.  Their liability is dependent upon Plaintiff sufficiently alleging that they conspired with state actors to deprive Plaintiff of his federal rights.

"The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'"  West v. Atkins, 487 U.S. 42, 49 (1988) (quoting United States v. Classic, 313 U.S. 299, 326 (1941)).  Accordingly, acts of a state or local employee in his or her official capacity will generally be found to have occurred under color of state law.  Id.

The Defendants argue that they did not act under color of state law because the alleged facts fail under the public function test.  For this contention they rely on Robinson v. Canterbury Village, Inc., 848 F.2d 424 (3d Cir. 1998) (holding that eviction of city council members by real estate developer did not meet public function test).  But this argument misses the central issue in

31

the present case.  The public function test is generally used to evaluate whether <u>private parties</u>

acted under the color of state law.  <u>See e.g.</u>, <u>West</u>, 487 U.S. 42 (private physician's provision of

medical care to inmates); <u>Flagg Bros., Inc. v. Brooks</u>, 436 U.S. 149 (1978) (warehouseman's

proposed private sale of goods entrusted to him for storage); <u>Robinson</u>, 848 F.2d 424 (real estate

developer).  Defendants A. Carew, Hering, and Cocula, Shortway are <u>public officials</u>.  Their

actions vis-à-vis Plaintiff were inextricably entwined with their public duties.  Another case cited

by the Defendants, <u>Max v. Republican Committee of Lancaster County</u>, 587 F. 3d 198 (3d Cir.

2009) (finding that actions by members of a local political committee failed to meet the public

function test and there was no indication that the defendants acted in conjunction with state

officials) is distinguishable for the same reason.

     The Defense does cite cases that involve the actions of government officials, but they are

distinguishable from the present case.  In <u>Johnson v. Knowles</u>, 113 F.3d 1114 (9th Cir.1997), the

court found that the ousters of homosexual members from a Republican party committee were

not under color of state law, even though a state assemblyman was an <u>ex officio</u> member of the

committee and was alleged to have worked to remove the plaintiffs.  <u>Id.</u>  The court reasoned that

the Assemblyman's alleged wrongful actions were not in any way related to his official duties

because his membership on the committee did not derive from his status as a state official and

his powers on the committee were equal to all other members.  <u>Id.</u> at 1117-18.

     The court in <u>Laxalt v. McClatchy</u>, 622 F.Supp. 737 (D. Nev. 1985) held that a United

States Senator's demand letter, sent to the plaintiff before filing a defamation action for stories

linking him to organized crime, was not under color of state law for the purposes of a "Bivens"

claim.  <u>Id.</u>  The court determined that, notwithstanding the use of his official stationary, the

Senator acted just as any private party could have under the laws of Nevada.  <u>Id.</u> at 747-48.

In <u>Valenti v. Pennsylvania Democratic State Committee</u>, 844 F.Supp. 1015 (M.D.P.A. 1994), the court denied the plaintiff's motion for a preliminary injunction against a state Democratic party and various leaders of the party, including a state senator.  The defendants allegedly prohibited candidates for statewide office from distributing certain literature at a Democratic party endorsement meeting.  The court found that the allegations "deal[t] only with a meeting of Democrats from around the Commonwealth [of Pennsylvania] to decide which Democratic candidates in the primary election will be endorsed by the state Democratic party." <u>Id. at 1018</u>.  This meeting would not determine who would appear on the primary ballot, who would win the primary, or who would be the Democratic nominee in the general election.  <u>Id.</u>  Additionally, it did "not arise from any state action, such as the state's delegation of authority" to conduct primary elections.  <u>Id.</u> at 1019.

The actions of the Defendants in the present case are closely entwined with municipal functions, unlike the actions in <u>Johnson</u>, <u>Laxalt,</u> or <u>Valent</u>i.  The alleged actions by the Defendants did not take place simply at partisan political meetings, but at Township Council meetings.  Nor did they involve only internal party politics, but they allegedly influenced the very decisions a popularly elected Councilmember made for the people he represented.  It is well established that "the freedom to associate for the 'common advancement of political beliefs'. . . necessarily presupposes the freedom to identify the people who constitute the association, and to limit the association to those people only." <u>Democratic Party of U.S. v. Wisconsin</u>, 450 U.S. 107, 122 (1981) (citation omitted).  However, the Plaintiff does not allege that he was ousted from a <u>private partisan committee</u> because his <u>political beliefs</u> were not in line with other members; he alleges that he was threatened and harassed until forced to resign from a

government body because his speech and actions as a democratically elected representative of his community were not to the liking of the Defendants.

The Defense attempts to untangle their entwined partisan and official actions by explaining that none of the duties of their various positions as Council members and employees of the Township involved ensuing the continued service or urging the resignation of a Councilman.  This argument fails.  It is well established that not every action of a public official is "under color of state law" for the purposes of § 1983.  See Bonenberger, 132 F.3d at 24.  However, while a defendant's actions pursuant to his or her "legitimate duties" may satisfy the color of law requirement, it is certainly not a necessary condition.  See e.g., Barna v. City of Perth Amboy, 42 F.3d 809, 816 (3d Cir. 1994) (stating that "acts of state or local employees in their official capacity will generally be found to have occurred under color of state law . . .whether the complained of conduct was in furtherance of the state's goals or constituted an abuse of official power." (Citing West, 487 U.S. at 49-50)).  To paraphrase Justice Sotomayor when she was serving as a Court of Appeals Judge, if Section 1983 were understood to reach only acts closely related to the nature of the official's legitimate duties, then the statute would perversely fail to offer protection against more wanton misuse of state power.  United States v. Giordano, 442 F.3d 30, 44 n. 19 (2d Cir. 2006) (finding there was sufficient evidence to prove that defendant acted under color of law, as required to support convictions under 18 U.S.C. § 242 for sexual abuse of minors); see also United States v. Price, 383 U.S. 787, 794 n.7 (1966) (noting that the 'under color of law' requirement of 18 U.S.C. § 242 and 42 U.S.C. § 1983 are identical).  The fact that the Defendants acted for personal reasons would not necessarily prevent a jury from finding that they acted under color of state law.  See Basista v. Weir, 340 F2d 74, 80-81 (3d Cir. 1965) ("Assuming arguendo that Scalese's actions were in fact motivated by personal animosity

34

that does not and cannot place him or his acts outside the scope of Section 1983 if he vented his ill feelings towards Basista . . . under color of a policeman's badge.").

Furthermore, Plaintiff need not allege that all of the Defendants are state officers in order to satisfy the "under color of state law" requirement of Section 1983.  See Dennis v. Sparks, 449 U.S. 24, 27-28 (1980) (citing Adickes v. S. H. Kress & Co., 398 U.S. 144, 152 (1970); and Price, 383 U.S. at 794); see also Abbot v. Latshaw, 164 F.3d 141, 147-48 (3d Cir. 1998).  Under the "joint participation" doctrine, the Defendants who are not state officers may be found to have acted under color of state law if they were willful participants in a joint action with the State or its actors.  See Dennis, 449 U.S. at 27-28; see also Abbot, 164 F.3d at 147-48.

The Plaintiff makes a number of allegations that suggest a conspiracy existed between the Defendants to deprive him of his constitutional rights.  For instance, he alleges that when he spoke during Council meetings and took positions on resolutions that were contrary to those of A. Carew and Oroho, both Cocula and Hering called Plaintiff to harass him and warn him to stop.  Weiner and Cocula met with Plaintiff in Cocula's home and told him that he would be hurt if he did not resign from the Council.  Cocula's emails to Plaintiff, many of which were copied to Hering, seem to implicate A. Carew, Hering, and Weiner in the conspiracy.  Plaintiff alleges that on a number of occasions between September 27 and October 27, 2008, Hering or A. Carew or both threatened and intimidated him, and several persons called Plaintiff's workplace and hung up when asked to give their names.  It is further alleged that each of the individual Defendants agreed in the November 7, 2008, meeting to use Hering's position as an armed law enforcement officer to secure the Plaintiff's resignation from the Council.

The color of law inquiry is highly fact-intensive.  Griffin v. City of Opa-Locka, 261 F.3d 1295, 1303 (11th Cir. 2001) (noting that "[w]hether a government employee is acting under color

35

of law is not always an easy call . . . . It is only through a process of 'sifting facts and weighing circumstances' that we arrive at a correct determination."  (Citing McDade v. West, 223 F.3d 1135, 1139 (9th Cir.2000)).  In the case of a police officer defendant, the factors relevant to this inquiry include, inter alia, whether the defendant was on duty, see West v. Atkins, 487 U.S. at 50 ("[G]enerally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law[.]"); whether the events took place within the geographic area covered by defendant's police department, see Barna, 42 F.3d at 816-17; whether he identified himself as a police officer, see Griffin v. Maryland, 378 U.S. at 135; whether he was wearing police clothing, see Abraham v. Raso, 183 F.3d 279, 287 (3d Cir. 1999); and whether he showed a badge, see Bonenberger, 132 F3d at 24.

The detailed allegations of November 7, 2008, are the clearest example of a potential abuse of state power on the part of the Defendants.  After enduring months of threats and intimidation by Officer Hering, including the threat to "out" him as a pedophile, the two met in the Police Department parking lot.  Hering was armed, in uniform, on duty, and refused to give the Plaintiff time to think about his resignation.  Taking all of the allegations of the Amended Complaint as true, the Plaintiff makes a colorable claim that state actor Defendants and their co-conspirators were acting under color of state law to deprive Plaintiff of his federal rights

### iii. Municipal Liability Under 42 U.S.C. § 1983

Plaintiff alleges the Township is liable for his injuries under 42 U.S.C. § 1983 because A. Carew, the Mayor and a member of the Council is the highest-ranking official in the Township and vested with the decision and policy making responsibilities for the Township; and Shortway

is the Deputy Mayor and a member of the Council.[16]   In disputing the municipal liability claim, the Defendants rely entirely on the argument made to dispute the "color of law" element of § 1983 liability, namely, that they were not acting in their official capacity but were acting as private citizens, vigorously involved in local politics.  The Court has already explained why this argument is unavailing, and so will address the merits of the municipal liability claim.

Municipalities are "among those persons to whom § 1983 applies."  Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 (1978).  However, "a municipality cannot be liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory."  Id. (emphasis in original).  Rather, the Township can be held liable for any constitutional deprivations suffered by Plaintiff only if "there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation."  City of Canton v. Harris, 489 U.S. 378 (1989); See also St. Louis v. Paprotnik, 485 U.S. 112, 123 (1988) ("Only those municipal officials who have final policymaking authority may by their actions subject the government to § 1983 liability.") (Internal quotations and citations omitted)).  This requirement "ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality."  Bd. of the County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 402 (1997) (citing Monell, 436 U.S. at 694).  Furthermore, "an act performed pursuant to a custom that has not been formally approved by an appropriate decision maker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law."  Id., see also Adickes, 398 U.S. at 167.

---

[16] Plaintiff also charges the Police Department with municipal liability, but as discussed in section "A" the Police Department is dismissed as a Defendant.

"An individual's conduct implements official policy or practice under several types of circumstances, including when (1) the individual acted pursuant to a formal government policy or a standard operating procedure long accepted within the government entity, (2) the individual himself has final policy-making authority such that his conduct represents official policy, or (3) a final policy-maker renders the individual's conduct official for liability purposes by having delegated to him authority to act or speak for the government, or by ratifying the conduct or speech after it has occurred."  Hill, 455 F.3d 225 (citing Pembaur v. City of Cincinnati, 475 U.S. 469, 478-484 (1986) (additional citations omitted)).

Whether an official is a final policy-maker is an issue of law to be determined by the court with reference to state and local law.  Jett v. Dallas Indep. Sch. Dist. 491 U.S. 701, 737 (1989).  The New Jersey law that governs Vernon's system of government leaves much to the municipality to specify in their charter.  See e.g., N.J. Stat. Ann. § 40:69A-83 ("The municipal council shall consist of five members, unless otherwise provided in the municipal charter[.]") Vernon's local ordinances and charters are not readily accessible to the Court, and have not been provided by the Plaintiff or the Defendants.  However, the Defendants on this motion do not directly dispute that A. Carew, Mayor of Vernon and a member of the Council, had final policy-making authority.  The Court will therefore assume that the Plaintiff's contention that A. Carew had final policy-making authority for the Township as true for the purposes of this motion.

Based on the Plaintiff's allegations that A. Carew was part of the conspiracy to deprive the Plaintiff of his First Amendment rights, the municipal liability claim withstands the motion for judgment on the pleadings.  The emails quoted by the Plaintiff in the Amended Complaint suggest that A. Carew was at the very least aware that Hering and Cocula were pushing the Plaintiff to resign his Council seat.  The Plaintiff also contends that A. Carew was one of the

VRC members who agreed in the November 7, 2008 meeting to use Hering's position as a law enforcement officer to secure Plaintiff's resignation.  It may be that A. Carew's single act of delivering Plaintiff's resignation to the Township clerk is enough to impose liability on the Township.  See Pembaur, 475 U.S. at 480 (1986) ("municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances").  Furthermore, Plaintiff makes a colorable claim of municipal liability based on the "ratification" prong of Hill. See 455 F.3d at 255.  In delivering the letter of resignation to the Township clerk, A. Carew may be found to have been ratifying Hering's threats and harassment of the Plaintiff.

These and other factual allegations in the Amended Complaint "raise a reasonable expectation that discovery will reveal evidence of the necessary element," thereby justifying the advancement of the municipal liability claim "beyond the pleadings to the next stage of litigation."  See Phillips, 515 F.3d at 234-35.

## C. Plaintiff's Common Law Claims

*Count Ten: Conspiracy to Deprive Plaintiff of Rights Under the New Jersey Civil Rights Act*

*Count Eleven: Abuse of Process*

*Count Twelve: Fraud and Deception*

*Count Thirteen: Intentional Infliction of Emotional Distress*

*Count Fourteen: Assault*

*Count Fifteen: Prima Facie Tort*

*Count Sixteen: Conspiracy*

Plaintiff's six common law claims set forth in Counts Eleven through Sixteen are so grievously deficient under the principles of Iqbal and Bell Atlantic that they must be summarily dismissed.  Although Plaintiff elaborated at great length his general treatment at the hands of the

Defendants, nowhere does Plaintiff address the facts pertinent to each common law claim.  Nor does he set forth the elements of each common law claim and detail specific facts that raise his right to relief above the speculative level.

For example, in Count Eleven's abuse of process claim, Plaintiff fails to state the elements of abuse of process, what process was abused, and how each Defendant abused it.

The most grievously defective Count is Count Twelve which charges in general terms fraud.  Fraud is a complex civil offense having many elements.  Pleading fraud places a heavy burden on a plaintiff.  Here Plaintiff has not even set forth the elements of a fraud or deception or attempted to show how each or any Defendant engaged in the conduct that would give rise to a fraud claim.

The balance of the common law Counts suffer from the same deficiencies and must be dismissed.  The dismissal will be without prejudice and Plaintiff will be given leave within 30 days to move as to these Counts only to file an amended complaint if he can allege facts supporting any of these common law claims.

### D. Plaintiff's Motion for Default Judgment as Against VRC

With his cross-motion for leave to amend to the complaint and add parties, Plaintiff purports to move for default judgment against VRC.  Default judgment against this defendant is inappropriate for resolution as a cross-motion at this stage because Plaintiff has not obtained a Clerk's entry of default; the motion for default judgment is not related to the other motions at issue; the Court vacated the Clerk's entry of default on the Original Complaint; and damages are not readily ascertainable.  Therefore, the Plaintiff's Motion for default judgment as against VRC is denied.

### III.  CONCLUSION

For the foregoing reasons, (1) the Police Department is dismissed as an independent defendant;  (2)  Defendants' motion to dismiss Counts One, Two, Three and Nine (federal and state RICO claims) is granted, and said Counts are dismissed with prejudice; (3) Defendants' motion to dismiss Count Seven (substantive due process claim under Fourteenth Amendment) is granted as the Count is redundant; (4) Defendants' motion to dismiss Counts Four (claim of deprivation of free speech), Five (claim of deprivation of right of assembly), Six (claim of deprivation of religious right), Eight (municipal liability claim) and Ten (claim of conspiracy to deprive Plaintiff of rights under the New Jersey Civil Rights Act) is denied; (5) Defendants' motion to dismiss common law Counts Eleven (abuse of process), Twelve (fraud and deception), Thirteen (intentional infliction of emotional distress), Fourteen (assault), Fifteen (prima facie tort) and Sixteen (conspiracy) is granted without prejudice with a right to move for leave to file an amended complaint as to these Counts only within 30 days if Plaintiff can allege sufficient facts supporting any of those state common law claims; (6) Plaintiff's motion for a default judgment against the VRC is denied.

The Court will enter an order implementing this opinion.


*/s/ Dickinson R. Debevoise*
DICKINSON R. DEBEVOISE
U.S.S.D.J.

Dated: July 21, 2010